## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

YOSSI AVITAN,

         Defendant

Criminal Action No. 17-17 (CKK)

## MEMORANDUM OPINION
(October 4, 2018)

In this criminal action, Defendant Yossi Avitan is charged with Conspiracy to Operate an

Unlicensed Money Transmitting Business in violation of 18 U.S.C. §§ 2, 371, and

1960(b)(1)(A), (B), and (C). Defendant has moved under Federal Rule of Criminal Procedure

12(b)(3) to suppress certain statements Defendant made to law enforcement agents that were

allegedly procured unconstitutionally. The government has indicated that it does not intend to

use Defendant's statements during its case in chief but does want the option of using the

statements for impeachment. Defendant argues that the government cannot use the statements,

even for impeachment, because they were obtained involuntarily in violation of the Due Process

Clause. Because the government will not use the statements during the case in chief, the Court

need only determine if the statements were obtained voluntarily as required by the Due Process

Clause. *See Oregon v. Hass*, 420 U.S. 714, 723-24 (1975) (allowing statements obtained in

violation of *Miranda* to be used for impeachment if there is no evidence that the statements

"were involuntary or coerced").

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. to Suppress Statements, Request for Hearing and Incorporated Memorandum of Points and Authorities ("Def.'s Mot."), ECF No. 121; and

whole, the Court DENIES Defendant's Motion to Suppress. The Court concludes that the statements were made voluntarily under the Due Process Clause.

## I. FINDINGS OF FACT

The Court held an evidentiary hearing on Defendant's motion to suppress on August 27, 2018 and September 5, 2018. The Court has considered the evidence presented at both days of the hearing. In doing so, the Court considered the demeanor and behavior of the witnesses on the stand, the witnesses' manner of testifying, whether the witnesses impressed the Court as truthful, whether the witnesses impressed the Court as having an accurate memory and recollection, whether the witnesses had any motive for not telling the truth, whether the witnesses had a full opportunity to observe the matters about which they testified, and whether the witnesses had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case. The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witnesses in determining whether to accept it as true and accurate, as well as whether the testimony was contradicted or supported by other credible evidence. The Court has also considered the pleadings and the entire record in this case.

The Court credits the testimony of the witnesses Joseph Lewis, Daniel Harding, and Yossi Avitan as follows.

---

- Gov.'s Mem. in Opp'n to Mot. to Def. Avitan's Motion to Suppress Statements ("Gov.'s Opp'n"), ECF No. 138.
- Gov.'s Supp. Brief in Opp'n to the Def.'s Mot. to Suppress ("Gov.'s Supp."), ECF No. 176.
- Def.'s Supp. Mot. to Suppress Statements and Mem. Of Points and Authorities ("Def.'s Supp."), ECF No. 179.
- Gov.'s Opp'n to Def.'s Supp. Mot. to Suppress Statements ("Gov's Opp'n to Def.'s Supp."), ECF No. 181.

The Court makes the following findings of fact. The Court will first make findings of fact that are relevant to the Defendant's motion and undisputed and/or uncontroverted by any evidence, and then make findings as to facts that are relevant and disputed or controverted by some evidence.

## A. The Undisputed or Uncontroverted Relevant Evidence

Beginning in the Summer of 2015, United States law enforcement agents began investigating an allegedly illegal money transmitting service. August 27, 2018 Hr'g Tr. at 5: 1. On March 2, 2017, arrests took place in the United States and in Israel involving the allegedly illegal money transmitting service. *Id.* at 5: 8-11. Defendant Yossi Avitan was not arrested at that time because law enforcement anticipated his presence at a residence in Miami, Florida, but he was not there. *Id.* at 5: 21-25. Instead, Defendant was in Morocco, a country which does not have an extradition treaty with the United States. *Id.* at 9: 21-10: 2. Defendant knew that United States law enforcement would be unable to reach him while he was in Morocco. *Id.* at 111: 4-6.

About two to three days after the initial arrests took place, Defendant was told about at least some of the arrests by the wife of Itzhak Salama, another defendant in this case. *Id.* at 103: 9-12. Approximately three months after speaking with Defendant Salama's wife, Defendant spoke with Moshe Mazor, an Israeli attorney who is Defendant's friend. *Id.* at 90: 18-20. Mr. Mazor went to Morocco and told Defendant more about the March 2, 2017 arrests. He showed Defendant the indictment and explained that Defendant was one of the people in the indictment. *Id.* at 90: 22-25.

Following the conversation with Mr. Mazor, on August 8, 2017, Defendant called Federal Bureau of Investigation Special Agent Joseph Lewis. *Id.* at 91: 6-9. This call was Agent Lewis's

first contact with Defendant. *Id.* at 6: 6-9. When Agent Lewis received the call he was in the office of Assistant United State Attorney Diane Lucas. *Id.* at. 6: 12-13. Agent Lewis had an appointment and could not speak at that time, so he asked Defendant to call him back the next morning. *Id.* at 7: 13-16.

Defendant called back Agent Lewis the next morning. *Id.* at 7: 17-20. Defendant indicated that he had seen a piece of paper which had both the Agent's name and number and the Defendant's name on it. Defendant stated that he was calling to determine why Defendant's name was on this piece of paper. *Id.* at 6: 20-24. Defendant further explained that he had heard that agents had come to his home in Miami and told individuals at the home that "[t]he guy had some problems." *Id.* at 7: 1-5. Defendant stated that he was worried that he might be the individual to whom the agents were referring. *Id.* at 7: 4-6. Defendant indicated that he wanted to come to the United States to speak further about the matter. *Id*. at 8: 10-14. Agent Lewis asked Defendant if he had a lawyer; Defendant replied in the negative. *Id.* at 8: 19-22. This conversation occurred in English. *Id.* at 7: 23. The August 8, 2018 and the August 9, 2018 phone calls were later memorialized in an FBI 302 memorandum. *Id*. at 77: 18.

Over the next few days, Agent Lewis and Defendant communicated over the phone regarding Defendant's travel logistics. *Id.* at 9: 6-8. These conversations occurred in English over voice calls and text messages. *Id*. at 19: 21-22. Agent Lewis believed that Defendant was coming to the United States to cooperate with the authorities. *Id.* at 46: 12-13. In order to ensure that Agent Lewis could take custody of Defendant when he arrived in the United States, Agent Lewis coordinated an emergency Special Public Benefit Parole ("SPBP"). *Id.* at 9: 2-11. Under the SPBP, Defendant had to enter the United States through Washington, D.C. *Id.* at 9: 9-11.

On August 22, 2107 Defendant arrived at Dulles Airport in Virginia. *Id.* at 10: 3-5. Agent Lewis went to the airport with U.S. Treasury Department Special Agent Daniel Harding to meet Defendant. *Id.* at 10: 14-16. The agents were allowed to wait in the Customs and Border Patrol area. *Id.* at 11: 1-4. When Defendant arrived, he first went through primary inspection, which is the security that every person who enters the United States must go through. *Id.* at 11: 5-9. Defendant next went through a secondary screening area where he was asked questions by law enforcement. *Id.* at 11: 18-20. The agents could partially overhear the conversation between the law enforcement official and Defendant in the secondary screening area, and the conversation occurred in English. *Id.* at 12: 19.

After the secondary screening was complete, Defendant was released to the custody of the agents. *Id.* at 12: 24-25. The agents looked for a quiet, secluded place in the airport where they could talk to Defendant. *Id.* at 13: 7-9. They found a location where no one was sitting and escorted Defendant there. *Id.* at 13: 9-11. Defendant was not handcuffed, and he was free to move about. *Id.* at 13: 25. Once seated, the agents explained some of the documents they had and showed Defendant his arrest warrant. *Id.* at 14: 6-10.

The agents next showed Defendant the FBI's form for Waiver of Right to Presentment Without Unnecessary Delay. *Id.* at 15: 3-4. The form advised Defendant that he had a right to be taken to a court without unnecessary delay where a judge would advise him of his rights and charges against him. One of those rights is the right to an attorney. *Id.* at 16: 4-9. Agent Lewis read the entire form aloud to Defendant. *Id.* at 16: 11-12. Defendant did not ask to be taken to a judge after the form was read to him. *Id.* at 16: 13-14. Agent Lewis, Agent Harding, and Defendant signed the form. *Id.* at 15: 8-11.

Agent Lewis next used the FBI's Advice of Rights form to read Defendant his *Miranda* rights. *Id.* at 16: 18-19. The form advised Defendant that he had a right to be silent and that anything he said could be used against him. The form also advised Defendant of his right to an attorney. Agent Lewis sat next to Defendant and told him that he would read the form to him. *Id.* at 18: 1-5. The form was positioned so that both Agent Lewis and Defendant could read it. *Id.* at 18: 1-5. Agent Lewis read the first few lines, then asked defendant to read a line, so that Agent Lewis would know that Defendant could read in English, which Defendant did. *Id.* at 18: 1-5. After this, Agent Lewis read the rest of the form aloud with Defendant next to him. *Id.* at 18: 13. After having the form read to him, Defendant did not say that he wanted a lawyer or that he would not speak with the agents. *Id.* at 18: 24- 19: 3. Agent Lewis, Agent Harding, and Defendant signed the form. *Id.* at 17: 6-10.

An Advice of Rights form translated into Hebrew was not provided to Defendant. *Id*. at 19: 13-15. Agent Lewis testified that he knew that Hebrew was Defendant's first language. But, based on his prior conversations with Defendant, he thought that Defendant "spoke English very well." *Id.* at 19: 17-22; *Id.* at 51: 12-14. Defendant never told the agents that he did not understand the forms or that he did not understand what his rights were. *Id.* at 20: 2-7.

After Defendant had been advised of his rights, the agents asked Defendant if he wanted them to contact the Israeli or Moroccan embassies for him. Defendant declined. September 5, 2018 Hr'g, Tr. at 10: 12-24. The agents then advised Defendant that they were going to go to a hotel where they could talk with him privately. August 27, 2018 Hr'g Tr. at 21: 1-3. On the way to the hotel, Defendant indicated that he was hungry. *Id.* at 21: 7-8. The agents took Defendant to a Wegmans grocery store so that Defendant could get kosher food. *Id.* at 21: 9-12. While in the

car on the way to the grocery store and later to the hotel, Defendant and the agents engaged in small talk not directly related to the case. *Id.* at 21: 19-20. The conversations were in English, and Agent Lewis testified that Defendant did not appear to have any trouble communicating or understanding what was said in English. *Id.* at 22: 8-11.

Following the trip to the grocery store, the agents took Defendant to the hotel. *Id.* at 23: 2-3. The hotel suite had two bedrooms, two bathrooms, and a common living space. *Id.* at 23: 12-13. The agents shared one of the bedrooms and one of the bathrooms. Defendant had one of the bedrooms and one of the bathrooms for himself. *Id.* at 23: 14-17. Once in the hotel suite, the agents and Defendant engaged in some basic conversation in English. *Id.* at 23: 20-24. The agents also inventoried what Defendant had brought with him and took possession of his passports. *Id.* at 24: 1-6.

After this, Defendant went to his private bedroom. Agent Lewis and Agent Harding split the night with one of them sleeping and one of them staying awake in the common area. *Id.* at 24: 14-18. This was done both for Defendant's safety and to ensure that Defendant did not leave the hotel during the night. *Id.* at 24: 24-25: 10.

The next morning, August 23, 2018, the agents and Defendant had breakfast at the hotel, then returned to the room. *Id.* at 25: 13-16. Prior to asking Defendant questions, the agents reviewed Defendant's rights with him. First, the agents showed Defendant the form for Waiver of Right to Presentment Without Unnecessary Delay that he had signed the previous evening. *Id.* at 37: 14-16. The agents reviewed the form with Defendant, and he signed it again. *Id.* at 37: 15-16. The agents then gave Defendant a new form, the Continuing Waiver of Rights to Prompt Presentment for a Magistrate Judge Following Arrest. *Id.* at 37: 4-7. This form advises

defendants of their right to be taken to a judge without unnecessary delay. It also briefly advises defendants of their right to an attorney and their right to remain silent. *Id.* at 38: 21- 39: 10. The agents summarized the form for Defendant, reviewed parts of it, and asked him to sign it. *Id.* at 37: 16-19. While the agents read portions of the language to Defendant, they did not read the entire form aloud. *Id.* at 37: 23-24. Defendant signed the form and did not ask to be taken to a judge, to have an attorney present, or to remain silent. *Id.* at 38: 3-4.

After reviewing Defendant's rights, the agents began questioning Defendant. The agents began by asking Defendant basic information about his life and family. *Id.* at 26: 7-9. Defendant discussed time which he had previously spent in the United States. Defendant told the agents that he had worked for approximately three months in New York, then moved to Miami for a month before going back to Israel. *Id.* at 26: 21-25. Defendant returned to the United States in 2015 for an unknown period of time. *Id.* at 89: 14-16. While he was in the United States, Defendant had started a business and moved that business back to Israel. *Id.* at 27: 1-3. Defendant also discussed a mineral company that he owned which was registered in London, England. *Id.* at 112: 20. There was also some discussion of an oil mine in Nevada that Defendant had attempted to purchase. September 5, 2018 Hr'g, Tr. at 36: 23-24. The agents then began asking Defendant about his involvement in the allegedly illegal money transmitting service. *Id.* at 15: 19-22.

The interview on August 23, 2018 lasted approximately three to five hours, with breaks, including lunch, in between. *Id.* at 14: 9-15. Defendant was not handcuffed and was free to move about. August 27, 2018 Hr'g, Tr. at 41: 14-19. Defendant did not resist answering questions. *Id.* at 40: 9-11. And Defendant never asked to stop and never asked for a lawyer. *Id.* at 27: 20-22.

The interview, and all communication between Defendant and the agents, occurred in English. *Id.* at 25: 23-25. If there were things that Defendant did not understand, the agents might restate something or use a different word. *Id.* at 54: 4-16. Defendant testified that when he did not understand he would tell the agents that he does not speak English very well or he would tell them that he does not know how to say something. *Id.* at 95: 18-23. Additionally, if there were words that the Defendant did not know how to say in English, he used an application on his phone that would translate the Hebrew word into English. *Id.* at 101: 7-11.

While the interviews were not recorded, throughout the interview, Agent Harding took contemporaneous notes on his laptop of what Defendant was saying. September 5, 2018 Hr'g, Tr. at 15: 8-10. Agent Harding's contemporaneous notes were later memorialized into an approximately 15-page 302 memorandum of understanding. August 27, 207 Hr'g Tr. at 40:1-5.

Following the August 23, 2017 interview, the agents and Defendant again spent the night in the hotel in the same manner in which they had the first night. *Id.* at 42: 7-9. On the following morning of August 24, 2017, the agents took Defendant to the Washington, D.C. field office of the Federal Bureau of Investigation where he was processed. *Id.* at 43: 5-9. Defendant was then taken to the courthouse and handed over to the U.S. Marshal's Service for his initial appearance in court. *Id.* at 43: 8-11. At his court appearance, Defendant's counsel was present. *Id.* at 43: 13-15. The agents had been under the impression that they were going to continue working with Defendant, but the agents were instructed that all future communication should go through Defendant's counsel. *Id.* at 43: 15-22.

Following the initial appearance, the agents transported Defendant to an apartment in Washington, D.C. where he was going to stay. *Id.* at 43: 22-25. The agents engaged Defendant in small talk in English but did not discuss the pending charges. *Id.* at 44: 9-14.

On August 28, 2017, Defendant engaged in a debrief with the agents, Assistant United States Attorneys, and his own attorney. September 5, 2018 Hr'g, Tr. at 19: 11-25. A Hebrew interpreter was also present. *Id.* at 20: 4-5.

The agents' final interaction with Defendant occurred on September 10, 2017. Defendant called and left a voicemail on Agent Harding's office phone. *Id.* at 25: 20-21. In the voicemail, Defendant mentioned something about antiquities and wanting to see Agent Harding. *Id.* at 26: 1-3. Defendant asked Agent Harding to call him back. *Id.* at 26: 2. When Agent Harding called Defendant back, Defendant reiterated what he had said in the voicemail. Agent Harding told Defendant that, following the instructions of Defendant's attorney, he could not meet Defendant or have any interactions with him. *Id.* at 26: 8-13.

## B. The Disputed or Controverted Relevant Evidence

The Court also notes two relevant points that were the subject of competing evidence at the evidentiary hearing. First, some contradictory evidence was presented regarding the extent to which Defendant used the Hebrew interpreter during the August 28, 2017 debrief. Agent Harding testified that the interpreter provided some instruction to Defendant at the beginning of the debrief, but the interpreter did not interpret throughout. *Id.* at 20: 11-17. Instead, Defendant directly answered the questions he was being asked in English. *Id.* at 21: 1-4. But, Defendant testified that he used the interpreter throughout most of the meeting and only occasionally spoke in English when he thought the interpreter did not understand what he was saying. *Id.* at 95: 4-

14.

The Court credits the testimony of Agent Harding on this point. At the evidentiary hearing, Defendant testified about his use of the interpreter at the debrief only after all the witnesses were finished and counsel had made their final arguments. Following counsels' arguments, the Court asked Defendant's counsel if he had a response to Agent Harding's testimony that Defendant had not used the interpreter at the debriefing. *Id.* at 87: 22- 88:11. A discussion then ensued between counsel and the Court about whether Defendant had required the interpreter during the debrief. It was only after this prompting that Defendant, having been recalled as a witness, testified that he had used the interpreter for the majority of the debrief. Accordingly, the Court credits Agent Harding's testimony on this issue.

Second, there is contradictory testimony around a statement that Agent Lewis allegedly made to Defendant about his need for counsel. Defendant testified that before he signed the Waiver of Right to Presentment Without Unnecessary Delay and the Advice of Rights forms at the airport on August 22, 2017, Defendant asked the agents if he needed a lawyer. August 27, 2018 Hr'g Tr. 94: 6-7. Defendant testified that Agent Lewis told him that "if I haven't done anything I don't need an attorney." *Id.* at 94: 7-8. Agent Lewis testified that he did not recall whether Defendant asked him this question or whether he responded with that statement. *Id.* at 74: 7-8. Agent Harding testified that it was his best memory that this exchange did not happen. September 5, 2018 Hr'g, Tr. at 44: 13-20.

The government has indicated that it does not intend to use Defendant's statements during its case in chief. Instead, the government intends to use the statements only for impeachment. Because the statements will not be used in the government's case in chief, the

Court need not determine how this alleged statement would or would not affect whether or not Defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent. *See Oregon v. Hass*, 420 U.S. 714, 721 (1975) (explaining that statements made in violation of Miranda may not be used in the government's case in chief). Accordingly, the Court does not make any credibility determinations on this issue.

## II. DISCUSSION

Defendant argues that the statements he made on August 22, 2017 and August 23, 2017 were made involuntarily in violation of the Due Process Clause. As such, Defendant argues that the government should not be able to use the statements, even for impeachment. The Court disagrees and finds that the Defendant made the statements voluntarily.

A criminal defendant's statement is inadmissible for any purpose "'if under the totality of the circumstances it was involuntarily obtained.'" *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008) (quoting *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991)). Voluntariness turns on whether "'the defendant's will was overborne' when he gave the statement." *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). "[T]he test for this is whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *Id.* (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)). "The Government must establish the voluntariness of a confession by a preponderance of the evidence." *Reed*, 522 F.3d at 359.

Determining a statement's voluntariness is a legal question that "requires a careful evaluation of all the circumstances of the interrogation." *Murdock*, 667 F.3d at 1305 (internal quotations omitted). Pertinent factors in this totality-of-the-circumstances analysis include the

defendant's "age, education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning." *Id.* at 1305-06 (citing *Schneckloth*, 412 U.S. at 226). The D.C. Circuit has held that "'egregious facts [are] necessary to establish that the statements . . . made during questioning [are] involuntary.'" *United States v. Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016) (quoting *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012)). "Statements made where the circumstances are less than 'egregious' are usually voluntary." *Id.* "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

Considering the totality of the circumstances, the Court concludes that Defendant's statement was voluntary under the Due Process Clause. The Court's analysis concentrates on Defendant's role in initiating discussions, the agents' general treatment of Defendant, Defendant's characteristics, and Defendant's advisement of his rights.[2]

First, Defendant played an important role in initiating and continuing communication with the agents. Defendant contacted Agent Lewis and offered to come to the United States to resolve the charges against him. When Agent Lewis could not speak on August 8, 2018,

---

[2] Defendant faults the agents for failing to memorialize their interaction with Mr. Avitan through the use of either audio or visual recording. The Court agrees that recording Defendant's interactions with the agents would have better ensured Defendant's rights and provided an accurate record of events. But, there is no constitutional requirement that custodial interviews be recorded by a particular means. Here, Defendant's August 23, 2017 interview was memorialized through Agent Harding's contemporaneous notes. While an audio or a video recording may have been preferable, the Court does not find that the absence of such a recording rendered Defendant's statements involuntary. *See United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) (explaining that there is "no constitutional requirement that confessions be recorded by any particular means" and that the lack of a recording did not render a waiver of rights involuntary).

Defendant called him back to talk the next day. August 27, 2018 Hr'g Tr. at 7: 13-16. Prior to contacting Agent Lewis, Defendant had previously been told about the arrests of those involved in the allegedly illegal money transmitting service. *Id.* at 103: 9-12. Defendant knew that agents had come to his home in Miami and insinuated that Defendant had legal problems. *Id.* at 7: 1-5. Defendant had also seen a copy of the indictment with his name in it. *Id.* at 90: 22-25. And Defendant had spoken to a lawyer, who is his friend, about the indictment. *Id.* at 90: 18-20. In addition to his awareness of the pending charges in the United States, Defendant also knew that as long as he remained in Morocco, it would be impossible for the United States to extradite him. *Id.* at 111: 4-6. Despite knowing that there were pending charges against him in the United States and that he could not be extradited from Morocco, Defendant, of his own volition, reached out to Agent Lewis and asked to come to the United States so that he could discuss his legal problems with the agents.

Defendant's voluntary choice to speak with the agents was evidenced even after he was appointed counsel. Following Defendant's appointment of counsel and debrief with the government, Defendant called Agent Harding. Agent Harding informed Defendant that he could only speak to Defendant through defense counsel. September 5, 2018 Hr'g, Tr. at 26: 1-13. Defendant's repeated decisions to reach out to the agents, even after he had been appointed counsel, are evidence that Defendant's statements were voluntary. *See Hallford*, 816 F.3d at 858-59 (finding evidence of voluntariness where defendant agreed to the interview without pressure from agents).

Second, the Court considers the agents' general treatment of Defendant as evidence that Defendant's statements were made voluntarily. The circumstances surrounding Defendant's two

interviews do not show any signs of intimidation, coercion, or deception. *See Connelly*, 479 U.S. at 167 (describing coercive police activity as a predicate for involuntariness). Once agents had taken custody of Defendant, they escorted him to a quiet, secluded area of the airport to go over his rights. August 27, 2018 Hr'g, Tr. at 13: 7-9. Defendant was not handcuffed and he was free to move about the area. *Id.* at 13: 25. Upon leaving the airport on August 22, 2017, the agents took Defendant to a specialty grocery store so that he could get Kosher food. *Id.* at 21: 9-12. After Defendant got food, the agents took him to a hotel. Defendant had a private bedroom and a private bathroom. *Id.* at 23: 13-17. The agents engaged in small talk with Defendant at the hotel that night but did not ask him substantive questions about the investigation because Defendant was tired due to the length of his flight. *Id.* at 82: 1-5.

The interview the following morning lasted approximately three to five hours. September 5, 2018 Hr'g, Tr. at 14: 9-15. Before beginning the interview, Defendant was given breakfast and the agents took breaks, including lunch, throughout. August 27, 2018 Hr'g, Tr. at 40: 19-23. Again, Defendant was not handcuffed and was free to move about the hotel suite. September 5, 2018 Hr'g, Tr. at 14: 16-20. Additionally, the agents did not pressure Defendant to answer questions, and there is no evidence that Defendant wanted to stop answering questions. August 27, 2018 Hr'g Tr. at 40: 9-11. The Court concludes that the circumstances surrounding Defendant's statements, in which defendant's essential needs were provided for, are further evidence that Defendant's statements were voluntary. *See Hallford*, 816 F.3d at 858-59 (finding evidence of voluntariness where the interview setting was not a "police-dominated atmosphere" and the agents did not deprive defendant of essentials); *see also United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011) (finding statements voluntary where the "tone of the interview was

cordial, its length was reasonable, and the defendant was not deprived of any essentials").

Third, the Court considers Defendant's characteristics and finds that they support the conclusion that the Defendant's statements were voluntarily made. Defendant is an adult who has previously lived and worked in the United States for short periods of time. Defendant lived and worked in New York for about three months and Miami for about a month and returned in 2015 for an unknown period of time. August 27, 2018 Hr'g Tr. at 26: 20-25; 89: 14-16. Defendant is also a sophisticated, international businessman. While in the United States, Defendant started a business which he later moved to Israel. *Id.* at 26: 24-27: 3. Defendant also owned an international mining company which was registered in London, England. *Id.* at 112: 20. These characteristics support a finding that Defendant's will was not overborne by the manner of the agents' questioning.

Defendant argues that the fact that he is not an American citizen and is not familiar with the American legal system supports a finding that his statements were involuntary. But, Defendant's citizenship is just one consideration. Despite being a non-citizen, Defendant understood the American legal system sufficiently to realize that he was suspected of a crime, had been indicted, and had agents looking for him in the United States. Additionally, Defendant spoke with a lawyer in Morocco about his indictment prior to contacting Agent Lewis. *Id.* at 90: 22-25. So, even if Defendant did not understand the nuances of the American legal system, he knew that he was in legal trouble and that he wanted to speak to law enforcement about it. Moreover, there is no evidence that Defendant had any mental impairments or that he otherwise would not have understood the import of his decisions. Instead, Defendant is a sophisticated, international businessman who has lived intermittently in the United States, started businesses in

the United States, and had an international mining company registered in London. *See United States v. Clarke*, 611 F. Supp. 2d 12, 33-34 (D.D.C. 2009) (finding statements voluntary where defendant was a non-citizen living outside of the United States with limited knowledge of the U.S. legal system and limited education); *see also United States v. Bourdet*, 477 F. Supp. 2d 164, 180 (D.D.C. 2007) (finding defendant's confession voluntary despite defendant's attempts to portray himself as a "uneducated pig farmer" from Guatemala "who could not understand his rights").

Defendant also argues that the fact that he spoke English as a second language is evidence that his statement was involuntary. But, the fact that Defendant spoke English as a second language does not render his statements involuntary. *See Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d 1989) (finding defendant's statements voluntary even though he was foreign-born, young, and had a poor command of English). As will be further explained below, the Court finds that Defendant had a sufficient command of English to be able to understand the questions asked of him by the agents and to understand the information he was conveying to the agents. *See Infra* pgs. 19-22. Accordingly, Defendant's command of English was sufficient to provide agents with voluntary statements.

Finally, the Court considers as evidence of voluntariness the fact that the agents repeatedly advised Defendant of his rights. Upon taking custody of Defendant, the agents immediately took him to a secluded, quiet location where they could advise him of his rights. The agents first showed Defendant the FBI's form for Waiver of Right to Presentment Without Unnecessary Delay. August 27, 2018 Hr'g Tr. at 15: 3-4. This form advised Defendant of his right to be taken to a court without unnecessary delay where a judge would advise him of his

other rights and the charges pending against him. *Id.* at 16: 4-9. Agent Lewis read the entire form aloud to Defendant *Id.* at 16: 11-12. After the form was read to him, Defendant did not indicate that he did not understand, nor did he ask to be taken to a judge. *Id.* at 16: 13-14. Agent Lewis, Agent Harding, and Defendant signed the form. *Id.* at 15: 8-12.

Agent Lewis next showed Defendant the FBI's Advice of Rights form. *Id.* at 16: 18-19. This form advised Defendant of his right to remain silent and that anything he said could be used against him. The form also advised Defendant of his right to an attorney. The form was positioned so that both Agent Lewis and Defendant could read it. *Id.* at 18: 1-5. Agent Lewis read the first few lines, then asked Defendant to read a line, so that Agent Lewis would know that Defendant could read in English. *Id.* at 18: 1-5. After Defendant read a line aloud, Agent Lewis read the rest of the form aloud with Defendant next to him. *Id.* at 18: 13. After having the form read to him, Defendant did not indicate that he did not understand his rights. Defendant also did not say that he wanted a lawyer or that he would not speak with the agents. *Id.* at 18: 24- 19: 1. Agent Lewis, Agent Harding, and Defendant signed the form. *Id.* at 17: 6-10.

The following morning of August 23, 2017, before beginning the substantive interview, the agents again apprised Defendant of his rights. First, the agents gave Defendant the Waiver of Right to Presentment Without Unnecessary Delay that he had signed the previous evening. *Id.* at 37: 14-15. The agents reviewed the form with Defendant, and Defendant signed it again. *Id.* at 37: 15-16. The agents next gave Defendant a new form, the Continuing Waiver of Rights to Prompt Presentment for a Magistrate Judge Following Arrest. *Id.* at 37: 4-7. This was a longer form which advised Defendant of his right to be taken to a judge without unnecessary delay, his right to an attorney, and his right to remain silent. *Id.* at 38: 21- 39: 7. While the agents read

portions of the language to Defendant, they did not read the entire form aloud. *Id.* at 37: 23-24.

Instead, the agents summarized the form for Defendant and reviewed parts of it. *Id.* at 37: 16-19.

Defendant signed the form. Defendant did not ask any question, nor did he ask to be taken to a

judge, to have an attorney present, or to remain silent. *Id.* at 38: 3-8.

Despite the fact that agents twice reviewed Defendant's rights with him, Defendant

argues that the advisement was insufficient under the Due Process Clause. Defendant has two

arguments for why the advisement of rights was insufficient. First, Defendant argues that his

command of English was too poor to understand what rights he had and what rights he was

waiving. Second, Defendant argues that Agent Lewis's alleged comment that he needed counsel

only if he had done something wrong rendered his subsequent statements to the agents

involuntary. Considering the totality of the circumstances, the Court finds that these arguments

do not make Defendant's statements involuntary.

First, the Court finds that Defendant's command of English was sufficient to understand

his rights and to decide voluntarily to speak with the agents. The fact that a person is not

proficient in speaking and understanding English has a bearing on that person's ability to

understand his or her freedom of choice. A non-English speaking person may be unable to

understand what rights they possess or how the waiver of those rights could be detrimental.

*United States v. Han*, 199 F. Supp. 3d 38, 53 (D.D.C. 2016). But, a non-native English speaker

can still voluntarily waive their rights if their command of English is sufficient to have

understood the warnings. *See Campaneria*, 891 F.2d at 1020. Here, the Court finds that

Defendant had a sufficient command of English to understand his rights as explained to him by

the agents and to decide to speak with the agents anyway.

On August 8, 2017, Defendant called Agent Lewis to discuss the pending criminal matter. August 27, 2018 Hr'g Tr. at 91: 6-9. In English, Agent Lewis directed Defendant to call back the next day. *Id.* at 7: 13-16. Defendant did so. Over the next two weeks, Agent Lewis and Defendant spoke in English over the phone and over text to coordinate Defendant's travel to the United States. *Id.* at 9: 6-8. Defendant comprehended these conversations sufficiently to arrange his flight for the proper date, time, and location.

On August 22, 2017, while the agents were explaining Defendant's rights, Agent Lewis asked Defendant to read a line from the Advice of Rights form aloud. Defendant was able to read the line aloud in English. *Id.* at 18: 1-5. Moreover, after Agent Lewis read the Waiver of Right to Presentment Without Unnecessary Delay and the Advice of Rights forms to Defendant, Defendant never indicated that he did not understand the forms or his rights. *Id.* at 20: 2-7. Upon leaving the airport, the agents and Defendant conversed in English about various topics on the way to the grocery store and to the hotel. *Id.* at 21: 19-20.

The following day, August 23, 2017, the agents questioned Defendant in English for three to five hours about the allegedly illegal money transmitting service. September 5, 2018 Hr'g, Tr. at 14: 9-15. During the interview, the agents reported that if there were words that Defendant did not understand, they might have to rephrase something. But Defendant's command of English was sufficient to allow him to communicate about sophisticated topics in English for hours. While Defendant spoke, Agent Harding took contemporaneous notes. *Id.* at 15: 8-10. These notes on Defendant's communications in English resulted in a comprehensive 302 memorandum of understanding that was approximately 15-pages long. It seems doubtful

that Defendant would have been able to convey so much detailed information if his command of English was as limited as he now claims.

Moreover, there were times when Defendant had access to translation services and chose to forgo them. During the August 23, 2017 interview, Defendant had a translation application on his phone that he could use. August 27, 2018 Hr'g Tr. at 101: 7-10. Defendant reported that he used this application only to translate words from Hebrew into English. *Id.* Defendant never used the application to translate the agents' statements from English into Hebrew so that he could understand what the agents were saying. *Id.* at 102: 12-16. Agent Harding testified that he remembered Defendant using his translation application only once when there was a "slang" word that the parties could not understand. September 5, 2018 Hr'g Tr. at 57: 5-16. Additionally, at his August 28, 2017 debrief, Defendant had access to an interpreter. *Id.* at 20: 4-5. Despite the presence of the interpreter, Defendant chose to communicate in English with the prosecution for at least some, if not most, of the session. *Id.* at 20: 11-21: 4.

In addition to the numerous occasions on which Defendant demonstrated a sufficient command of the English language, there is also testimony from the agents on Defendant's ability to understand English. Agent Lewis acknowledged that Defendant spoke in "broken" English and that "[s]ome of his words may not be the same present tense, past tense. He may not use the exact same English word that we may use in our natural speaking." August 27, 2018 Hr'g Tr. at 53: 16-21. But, Agent Lewis was still able to understand and to communicate with Defendant without significant issues. *Id.* Agent Harding echoed this sentiment, explaining that, while he could tell that English was not Defendant's first language, "[h]e had good English." September 5, 2018 Hr'g Tr. at 43: 12.

Even Defendant Avitan explained that "I can communicate in English, in a regular conversation. I can communicate with almost anyone." August 27, 2018 Hr'g Tr. at 112: 6-7. Defendant went on to explain that there are some words, especially higher-level words, that he does not understand. *Id.* at 95: 10-12. Moreover, when Defendant was asked if he read and understood the Waiver of Right to Presentment Without Unnecessary Delay and the Advice of Rights forms, Defendant responded that, while he could not read the forms, the agent explained the forms to the him. *Id.* at 93: 2-5. When given the opportunity, Defendant did not testify that he did not understand his rights as communicated to him by the agents.

Based on the evidence, the Court concludes that Defendant had a sufficient command of English to understand his rights and to voluntarily waive them. *See Campaneria*, 891 F.2d at 1020 (finding waiver valid where defendant's native language was Spanish and "he spoke in broken English with an accent and occasionally lapsed into Spanish"); *see also United State v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997) (finding waiver valid even though defendants were French-speaking because officers read the Miranda rights aloud, asked defendants if they understood their rights, and defendants responded affirmatively); *see also United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127-28 (9th Cir. 2005) (finding Spanish-speaking defendant's waiver valid because defendant indicated he understood his rights after they were read to him and there was no indication defendant had trouble understanding). Accordingly, considering the totality of the circumstances, the fact that Defendant speaks English as a second language does not support a finding of involuntariness.

Second, Defendant argues that Agent Lewis's alleged comment that Defendant needed a lawyer only if he had done something wrong renders his subsequent statements involuntary.

Assuming arguendo that Agent Lewis did make this comment, the Court concludes that the comment does not render Defendant's statements involuntary.

Statements made by a defendant "in circumstances violating the strictures of *Miranda* 'are admissible for impeachment if their trustworthiness … satisfies legal standards.'" *Murdock*, 667 F.3d at 1305 (quoting *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978)). Statements which are obtained in violation of *Miranda* are excludable from the government's case in chief but may still be used to impeach a Defendant should the Defendant choose to testify. *Id*. In deciding whether the statement obtained in violation of *Miranda* may be used for impeachment, the court considers whether or not the agent's "conduct amounts to an abuse." *Oregon v. Hass*, 420 U.S. 714, 723 (1975). If the agent's conduct amounts to an abuse, "that case, like those involving coercion or duress, may be taken care of … measured by the traditional standards for evaluating voluntariness and trustworthiness." *Id*.

Here, the Court finds that Agent Lewis's alleged statement does not constitute the type of abuse which would overcome Defendant's will and render his statements involuntary. On first taking custody of Defendant on August 22, 2017, the agents read him his rights, and Defendant never indicated that he did not understand them. It was while apprising Defendant of his rights the night of August 22, 2017 that Agent Lewis allegedly told Defendant he needed a lawyer only if he had done something wrong. But, the agents did not begin interviewing Defendant immediately after this. Instead, the agents only began substantively interviewing Defendant the following morning after they had again apprised Defendant of his rights.

Defendant primarily relies on *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011), for the proposition that Agent Lewis's comment rendered Defendant's statements involuntary. In

*Doody*, the court held that the defendant's confession was made involuntarily, in part, because the agent gave the defendant *Miranda* warnings which deviated substantially from the required format and repeatedly minimized the warning's significance. 649 F.3d at 1002-03. However, the faulty *Miranda* warning alone did not render the defendant's confession involuntary. Instead, the court in that case considered the entirety of the circumstances. *Id.* at 1008. The circumstances leading the court to conclude that the defendant's confession was involuntary included the fact that the defendant was a juvenile, the agents relentlessly questioned the defendant for thirteen hours, the defendant was not alert and non-responsive throughout much of the interview, the agents had a harsh and accusing tone and demeanor, and the agents told the defendant that he "had" to answer their questions. *Id.* at 1008-18.

In this case, none of the other factors are present which led the *Doody* court to find the defendant's confession involuntary. Here, at the time of the interview, Defendant was 33 years old and a sophisticated, international businessman. Defendant had voluntarily come to the United States to speak with the agents despite knowing that he had been charged with a crime. The agents were courteous to Defendant throughout the interview, giving him a private bedroom and bathroom, finding Kosher food for him, and allowing him breaks throughout. While Agent Lewis's alleged statement is some evidence of involuntariness, the Supreme Court's line of cases assessing voluntariness has never "turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). And, here, a careful scrutiny of all the surrounding circumstances demonstrates that Defendant's statements were voluntary.

Based on all of the evidence presented and the totality of the circumstances, the Court does not find these circumstances the sort of egregious circumstances that would render Defendant's statements involuntary. *See United States v. Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016) (requiring "egregious" circumstances to render statements made during questioning involuntary). Accordingly, the Court concludes that Defendant's statements were voluntary and can be used for impeachment purposes. Defendant's motion to suppress on these grounds will be DENIED.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's statements to the agents on August 22, 2017 and August 23, 2017 were made voluntarily and can be used for impeachment. Accordingly, the Court will DENY Defendant's Motion to Suppress. An appropriate Order accompanies this Memorandum Opinion.

    /s_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge