IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO.: 17-cr-00017-1 (CKK)** |
| | ) | |
| v. | ) | |
| | ) | |
| **YOSSI AVITAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## STATEMENT OF THE OFFENSE

Pursuant to Fed. R. Cr. P. 11, defendant YOSSI AVITAN agrees and stipulates as follows:

### Background Regarding Money Transmitting Businesses and a Hawala Network

1. A "hawala" is an alternative money transmitting business conducted by brokers known as "hawaladars" that operates outside of the traditional banking and financial systems and is premised on relationships of mutual trust. The hallmark of a hawala is the transfer and receipt of the value of currency for a fee without its actual physical movement.

2. In its most basic form, a hawala network involves at least two hawaladars. A customer approaches a hawaladar and gives the hawaladar a sum of money to be transferred to the beneficiary in another city/country. The hawaladar then contacts a hawaladar in the recipient city/country, instructs this individual to deliver equivalent funds, minus a fee, to the beneficiary, and promises to settle the debt between the two hawaladars at a later time. The hawaladar in the recipient city/country then contacts the beneficiary, confirms that the beneficiary is expecting the funds, and the funds are delivered to the beneficiary. The beneficiary/recipient of the funds typically receives the funds without producing identity documents.

3. In a hawala system there is no recorded agreement or written contract for the transaction and no legal means of reclamation. Rather, the deal is secured by the trust between the parties which is often forged through familial, ethnic, religious, regional, and/or cultural bonds, and which undergirds the "honor system" that the hawala requires. Typically, a hawala network is quite

extensive, involving the transfer of many types of currencies between various hawaladars in different cities/countries and across different continents, with the value of the money moving in a variety of directions from one city/country to another. In addition, hawaladars in the same country often "pool" together bulk currency to effectuate an "order" from another hawaladar if the amounts they individually possess are insufficient to satisfy an order.

4. Each time a hawladar gives payment instructions and a transaction occurs, a debt is created. Hawaladars typically maintain a running tally or balance sheet and settle their debts vis-à-vis one another on a regular basis. Money inflows and outflows are generally kept in relative balance with respect to the total amount of money each hawaladar puts into the network. Settlement between hawaladars can occur in several ways. Mostly, settlement occurs through monetary value being placed upon the "books" of a given hawaladar in either the hawaladar's home country or in another country designated by the hawaladar.

5. Hawala networks engage in monetary transactions where the source of the money is legitimate and monetary transactions where the source of the money is illegitimate.

### Facts Relevant to Defendant's Criminal Conduct

6. Defendant YOSSI AVITAN ("defendant" or "AVITAN") was born in Israel and was a resident of the United States.

7. Co-conspirator ITZHAK SALAMA was born in Israel and was a resident of the United.

8. Co-conspirator GOLAN CHKECHKOV was born in Israel, and was a naturalized citizen and resident of the United States

9. Co-conspirator MOSHE AMIR was born in Israel and was a resident of the United States.

10. Co-conspirator MICHAEL ADMON was born in Israel and was a resident of the United States.

11. Co-conspirator HAVIV ARAZI was born in Syria and was a citizen of Israel and a resident of the United States.

12. "Person A" was born in Israel and was a resident of Israel.

13. "Person B" was born in Hungary and was a resident of Hungary.

14. From on or about June 25, 2015, to on or about April 6, 2016, defendant YOSSI AVITAN, together with others known and unknown to the United States, including ITZHAK SALAMA, GOLAN CHKECHKOV, MICHAEL ADMON, and MOSHE AMIR, were in the business of transmitting funds on behalf of the public in interstate and foreign commerce without the applicable State license from the District of Columbia, New York, California, and elsewhere, and without having registered as a money transmitting business with the federal government, specifically, the Department of the Treasury.

15. Defendant AVITAN and his co-conspirators participated in a hawala network in order to obtain money by charging a fee for providing money transmitting services to the public in interstate and foreign commerce. Some members of the hawala network were located inside and outside of the United States.

16. At all times relevant to the Information, AVITAN was not an agent or employee of a registered or licensed money transmitting business.

17. At all times relevant to the Information, AVITAN was a resident of Florida and was in partnership with SALAMA in a mineral business.

18. Since at least June 2015, defendant AVITAN communicated with SALAMA, and AMIR regarding the money transmitting business and specifically discussed the delivery and pick-up of cash and/or wires of funds for the purpose of conducting monetary transactions on behalf of other individuals.

19. Defendant AVITAN and his co-conspirators operated their money transmitting business by, among other things, not having a "brick and mortar" business for money transmitting,

3

making anonymous arrangements for monetary transactions, conducting monetary transactions on the street, accepting and delivering cash funds in plastic bags with no corresponding documentation, and failing to file Currency Transaction Reports ("CTRs") with the Department of the Treasury.

20.   At all times relevant to the Information, defendant AVITAN decided whether to participate in a particular monetary transaction related to the hawala network. Defendant AVITAN also determined when money could be picked-up from him and/or delivered to him and transmitted through the hawala network on behalf of various individuals.

21.   At all times relevant to the Information, defendant AVITAN communicated with customers of the hawala network, coordinated monetary transactions with other members of the hawala network, arranged for the pick-up and/or delivery of cash. Defendant AVITAN's role in the hawala network was to arrange for the receipt and/or delivery of money on behalf of other individuals. Defendant AVITAN received a fee for conducting the monetary transactions.

22.   At all times relevant to the Information, defendant AVITAN operated the money transmitting business using cash transmissions to transfer money on behalf of other individuals. As part of the money transmitting business, AVITANconducted more than one monetary transactions on behalf of others in which he charged a fee for his money transmitting services.

### Undercover Transactions

23.   On June 15, 2015, PERSON B met with CHKECHKOV outside of a specific address on Eastern Parkway, Brooklyn, New York. PERSON B gave CHKECHKOV a bag containing $50,000 in cash for the purpose of transferring the money to another individual in the United Kingdom.

24.   Between June 16, 2015 and June 25, 2015, PERSON A communicated with defendant AVITAN and made arrangements for the return of the $50,000 from the hawala network.

25. On June 25, 2015, defendant AVITAN directed PERSON A to pick up the funds in Brooklyn, New York. PERSON A picked up $47,000 in cash from ADMON at his business located on 52nd Street in Brooklyn, New York.

**Transaction No. 3**

26. On August 31, 2015, PERSON A met with SALAMA and handed SALAMA $120,000 in cash for delivery through the hawala network.

27. While together, SALAMA and PERSON A discussed a number of things, including SALAMA's partnership with AVITAN in a mineral business in Nevada. SALAMA stated, "I am with him [AVITAN]. The big boy sits there, in Miami . . . We are generally in minerals . . . mining, mining, mining . . . Nevada."

28. During their discussion on August 31, 2015, SALAMA also told PERSON A about his and AVITAN's ability to transfer money to various cities, and the possibility of conducting future monetary transactions, including in Washington, D.C. SALAMA stated, "He [AVITAN] is strong on papers . . . Very strong, he [has been doing it for] many years . . . ." PERSON A asked, "Where is he taking from?" SALAMA replied, "The strongest is in New York and Miami." Later is the conversation, SALAMA stated that, "Yes, DC is problematic for us . . . Miami, *perfect*; New York, *perfect, perfect* . . . Here, half, sometimes, there is[,] sometimes there isn't. Sometimes it's possible, sometimes, it's not." PERSON A then asked, "Where else? That you know about?" SALAMA responded, "Just here in the States[] or in Europe, anywhere."

29. On September 3, 2015, defendant AVITAN told PERSON A that he could get around $53,000 in cash to PERSON A in Atlanta or Washington, D.C. and that the balanced would be wired. Defendant AVITAN and PERSON A scheduled the delivery of cash to PERSON A in Washington, D.C. for September 8, 2015. Defendant AVITAN instructed PERSON A to call him around noon on September 7, 2015, to confirm the delivery time.

30.     On September 7, 2015, PERSON A called defendant AVITAN, who gave PERSON A a telephone number for ARAZI.

31.     On or about September 8, 2015, ARAZI drove from Brooklyn, New York to Washington, D.C., to deliver $53,000 in cash to Person A.

32.     On or about September 8, 2015, Person A, who was in Washington, D.C. at the time, received a text from ARAZI concerning the delivery of cash by ARAZI to Person A in Washington, D.C.

33.     On or about September 8, 2015, ARAZI picked up PERSONA A in Washington, D.C. and then they drove together a few blocks to another location in Washington, D.C. ARAZI gave Person A a plastic bag and $53,000 in cash.

34.     Between on or about November 3, 2015 and April 6, 2016, defendant AVITAN communicated with PERSON A more than once about moving money on behalf of others through the hawala network, including meeting with PERSON A, in Miami, Florida, along with SALAMA and AMIR.

35.     Defendant AVITAN affirmatively states that he has no information, evidence, or knowledge that his co-conspirators SALAMA, CHKECHKOV, ADMON, AMIR, and ARAZI were not involved in a conspiracy to operate an unlicensed money transmitting business on behalf of others and to contradict these facts.

36.     On or about sometime in 2015, ARAZI received $15,000 in New York and was asked by AMIR, on behalf of defendant AVITAN, to deliver the money in Washington, D.C. to a woman who had connections to someone in a foreign government.

37.     This proffer of evidence is not intended to constitute a complete statement of all facts known by defendant AVITAN, but is a minimum statement of facts intended to provide the

necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged crime.

Respectfully submitted,

JESSIE K. LIU
United States Attorney for the District of Columbia

BY: _/s/ Diane G. Lucas_
DIANE G. LUCAS, D.C. Bar. No. 443610
DAVID B. KENT, D.C. Bar No. 482850
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7724 (Lucas)
(202) 272-7762 (Kent)
Diane.Lucas@usdoj.gov
David.Kent@usdoj.gov

## **DEFENDANT'S ACCEPTANCE**

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 11/20/18

YOSSI AVITAN
Defendant

I have discussed this Statement of Offense with my client. I concur with his decision to stipulate to this Statement of Offense.

Date: 11/20/18

Brian McDaniel, Esquire
Attorney for the Defendant

8